1
2
3
4
5
6
7

# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>                          Plaintiff-Appellee,<br><br>v.<br><br>BUTA SINGH,<br><br>                          Defendant-Appellant. | Case No.:  19-CR-3623 BLM (DMS)<br><br>**ORDER AFFIRMING MAGISTRATE JUDGE CONVICTION AND JUDGMENT** |

On October 10, 2019, Defendant-Appellant Buta Singh ("Defendant" or "Singh") filed a timely notice of appeal to the district court.  (ECF No. 44.)  The Court has jurisdiction over the appeal pursuant to 18 U.S.C. § 3402.

## I.

## BACKGROUND

On July 9, 2019 at around 8:22 p.m., RVSS operator Sergio Trevino observed approximately six individuals enter the United States on a raft by crossing the All-American Canal.  (Bench Trial Transcript ("Trial Transcript"), ECF No. 48, at 15:17–24.)  The individuals entered the United States in a remote area, approximately two and a half miles from the nearest designated Port of Entry, the Calexico East Port of Entry.  (*Id.* at 31–32.)  Agent Trevino observed the individuals float north across the Canal, a few yards

north of and parallel to the border, and alerted other Border Patrol agents to the situation by radio.  (Trial Transcript at 18:1–19:16.)

After hearing Agent Trevino's radio alert, Border Patrol Agent Sergio Barron responded to the area.  He followed signs of footsteps and encountered two individuals, including one later identified as Defendant, hiding in the brush and crouching under a tree. (*Id.* at 36:21–37:1–5.)  He initially asked the individuals to come out in English and Spanish, but neither responded.  (*Id.* at 40:1–11.)  He thereafter gestured them to come out, and they did so.  (*Id.* at 40:12–16.)  Because they did not speak Spanish, Agent Barron guessed the individuals were Indian and asked "Punjabi?", to which Defendant responded by nodding.   (*Id.* at 40:18–24.)  Agent Barron thereafter walked the two individuals to a clear area, handcuffed them, and placed them alongside a third individual who was previously discovered in the area. (Trial Transcript at 41:1–7.)  He brought the three handcuffed individuals to Agent Derek Fulton and left to search for any remaining individuals in the area. (*Id.* at 39:10–12.)

Agent Fulton removed the individuals' handcuffs and placed them in a vehicle to obtain their biographical information and determine whether to arrest them.  (*Id.* at 56:1–12; 57:7–9; 84:1–18.)  Agent Fulton asked if the individuals spoke Spanish, and one responded.  (*Id.* at 57:1–3.)  Agent Fulton asked the Spanish-speaking individual for his documents, and he provided them.  (*Id.*)  Agent Fulton requested documents in Spanish and English from Defendant, but he did not respond.  (Trial Transcript at 57:1–3.)  After one of the other individuals pointed to Defendant's pocket, Defendant responded "Oh. Okay," pulled out his passport, and handed it to Agent Fulton.  (*Id.* at 57:1–6.)  Agent Fulton thereafter opened the passport and copied Defendant's biographical information into a field processing form, including his name, date of birth, and citizenship information, before returning the passport to Defendant.  (*Id.* at 58:9–20; 67:18–25.)

On July 10, 2019, Plaintiff-Appellee United States of America ("United States" or "Government") charged Defendant Singh with attempted illegal entry in violation of 8 U.S.C. § 1325(a)(1), a misdemeanor.  (ECF No. 1.)  Defendant's case proceeded under the

"Streamline" process, which the Department of Justice ("DOJ") uses to manage prosecution of misdemeanor charges brought under § 1325. *See United States v. Chavez-Diaz*, No. 18MJ20089 AJB, 2018 WL 9543024, at *1–2 (S.D. Cal. Oct. 30, 2018) (describing DOJ's "Operation Streamline" process, as implemented by the Government in this Court), *rev'd on other grounds*, No. 18-50391, 2020 WL 562292 (9th Cir. Feb. 5, 2020).

On the morning of Defendant's first court appearance, he was shackled and transferred from the Border Patrol Station to a parking garage next to the federal courthouse in San Diego. (Appellant's Opening Br. ("Opening Br."), ECF No. 57, at 2.) There, Defendant met his lawyer in a large room with other detainees and their lawyers, and his lawyer informed him that the Government had offered a plea agreement that would allow him to plead guilty to a Class B misdemeanor in exchange for the prosecutor's recommendation that he receive a time-served jail sentence. (*Id.*)

Defendant's trial was originally scheduled for September 13, 2019 (ECF No. 14.) On August 30, 2019, Government counsel emailed Defendant's counsel to inform them of their intent to introduce Defendant's passport into evidence at trial and inquired whether Defendant would like to inspect the passport. (Ex. D. to Opening Br.) After Defendant indicated he would like that opportunity, the Government informed Defense Counsel that it no longer had access to the passport because Border Patrol sent it to the Immigration and Customs Enforcement ("ICE") detention facility where Defendant was held pending trial. (Ex. E to Opening Br., at 5.) The Government indicated Defendant likely had access to the passport at the detention center, but Defense counsel responded that Defendant did not have access to it, though "the facility (who are government contractors) may be holding it[.]" (*Id.* at 4.) In response, the Government noted the passport was not in the custody of Border Patrol or the prosecution team. (*Id.* at 3.)

Before trial, Defendant filed pre-trial challenges including (1) a motion to dismiss under the Equal Protection and Due Process Clauses of the United States Constitution; (2) a second motion to dismiss arguing that § 1325 violates the nondelegation doctrine; (3) a

third motion to dismiss arguing § 1325 is unconstitutional in light of *Sessions v. Morales-Santana*, 137 S. Ct. 1678 (2017), and (4) a motion for jury trial, on grounds that Defendant intended to apply for asylum and a conviction under § 1325 would likely render his application unsuccessful. (*See* Ex. F to Opening Br.) The presiding magistrate judge, the Honorable Barbara L. Major, denied the motions. (*See* ECF No 53.)

The trial was continued to September 30, 2019, at which time Agents Trevino, Fulton, and Barron testified to the facts set out above regarding Defendant's arrest. (*See* Trial Transcript, ECF No. 48, at 15–26, 33–41, 56–63.) Agent Fulton testified about requesting documents from Defendant and the other detainees. (*See id.* at 56–63.) In addition to that testimony, the Government introduced three exhibits to prove Defendant's alienage. First, it moved to admit a photocopy of the document found on Defendant's person at the time of his arrest (the passport) under Federal Rule of Evidence 1003 as Government Trial Exhibit 5. (*Id.* at 7, 68–69.) Defense counsel objected on grounds she was not provided the opportunity to review the original passport for authenticity and requested the court to exclude the photocopy. (*Id.* at 8–9.) The Government responded that it did not seek to admit the document as a passport, but as a document found on Defendant at the time of arrest that evidenced he was not a United States citizen. (*Id.* at 71–72.) The magistrate judge admitted page 3 of the document, but excluded the rest of the document because the Agent "was unable to identify anything other than Page 3." (*Id.* at 76, 83.) Page 3 contained Defendant's name ("Buta Singh"), date of birth ("10/06/89"), country of citizenship or nationality ("Indian"), and place of birth ("4 SPS Salempura, Rajasthan"). (*See* Ex. A. to Opening Br., at 3.)

The Government also admitted two additional exhibits to prove alienage: Defendant's visa application, which contained information consistent with Exhibit 5, and a consulate certification (Exhibits 6 and 7). The magistrate judge found the latter two exhibits "sufficient to establish alienage." (Trial Transcript at 91:17–21.) The magistrate judge credited the testimony of all government witnesses, (*id.* at 92:10–11), and found

Defendant guilty beyond a reasonable doubt of misdemeanor attempted illegal entry in violation of 8 U.S.C. § 1325(a)(1).  (*Id.* at 92:7–14.)  This appeal followed.

## II.

## DISCUSSION

"In all cases of conviction by a United States magistrate judge an appeal of right shall lie from the judgment of the magistrate judge to a judge of the district court of the district in which the offense was committed." 18 U.S.C. § 3402.  "A defendant may appeal a magistrate judge's judgment of conviction or sentence to a district judge within 14 days of its entry." Fed. R. Crim. P. 58(g)(2)(B).

On appeal, Defendant raises five challenges to his conviction. First, Defendant argues he had the right to a jury trial given the serious consequences of a § 1325 conviction. (Opening Br. at 1, 7–9.)  Second, Defendant argues the magistrate judge erred by admitting the visa application under Federal Rules of Evidence 803(8) and 803(6).  (*Id.* at 1, 9–13.) Third, Defendant argues the magistrate judge violated the Federal Rules of Evidence, Federal Rules of Criminal Procedure, and the Fifth Amendment by admitting a partial copy of a document found on Defendant's person and considering it a passport.  (*Id.* at 1, 13– 21.)  Fourth, Defendant argues that § 1325(a)(1) is unconstitutional because it violates the Nondelegation Doctrine and the Equal Protection Clause.  (*Id.* at 1, 21–22.)  Fifth, Defendant argues his prosecution in "Streamline Court" violates Equal Protection and Due Process.  (*Id.* at 2, 22–23.)  Each argument is addressed in turn.

## A. **Right to Jury Trial**

Defendant argues the magistrate judge erred by conducting a bench trial and refusing to accommodate his request for jury trial.  Although Defendant was charged with a misdemeanor, he contends the circumstances of his offense constitute a "serious offense," thus triggering his Sixth Amendment rights.  (Opening Br. at 7–10.)

The Sixth Amendment guarantees certain trial rights to those accused in "all criminal prosecutions," including "the right to a speedy and public trial, by an impartial jury."  U.S. CONST. amend. VI.  The Supreme Court has interpreted the scope of the jury trial right as

applying to criminal prosecutions for "serious offenses." *Duncan v. Louisiana*, 391 U.S. 145, 157–58 (1968).  Criminal prosecutions for offenses that are "petty," rather than serious, may be tried by a judge without running afoul of the Sixth Amendment.  *Blanton v. City of N. Las Vegas*, 489 U.S. 538, 541 (1989).

The Supreme Court has set parameters for distinguishing between serious and petty offenses under the Sixth Amendment.  A serious offense is one "where punishment for more than six months is authorized[,]" *Baldwin v. New York*, 399 U.S. 66, 67, 69–70 (1970), whereas offenses with a maximum period of incarceration of six months are presumptively considered petty.  *Blanton*, 489 U.S. at 543.  This presumption can be overcome "if [the defendant] can demonstrate that any additional statutory penalties, viewed in conjunction with the maximum authorized period of incarceration, are so severe that they clearly reflect a legislative determination that the offense in question is a 'serious' one."  *See id.*  Accordingly, "[a]n offense carrying a maximum prison term of six months or less is presumed petty, unless the legislature has authorized additional penalties so severe as to indicate that the legislature considered the offense serious."  *United States v. Wallen*, 874 F. 3d 620, 625 (9th Cir. 2017) (quoting *Lewis v. United States*, 518 U.S. 322, 325 (1996) (quoting *Duncan v. Louisiana*, 391 U.S. 145, 159 (1968))).

In *United States v. Rodriguez-Rodriguez*, the Ninth Circuit, addressing this issue, held "[t]he alleged collateral consequences that may flow from future illegal behavior do not convert the border-crossing misdemeanor [under § 1325] into a 'serious offense' for which the Sixth Amendment requires a trial by jury."  742 F.2d 1194, 1195 (9th Cir. 1984) (citing *Baldwin*, 399 U.S at 66.)  Applying this logic, courts within this district have held the possibility of deportation does not convert a misdemeanor improper entry under § 1325 into a serious offense because deportation is "not a penalty [the legislature] authorized as a consequence of conviction[.]"  *See, e.g.*, *United States v. Ramirez-Ortiz*, 370 F. Supp. 3d 1151, 1157 (S.D. Cal. 2019) (citing *Rodriguez-Rodriguez*, 742 F. 2d at 1194 and 8 U.S.C. § 1325(a)).  Rather, the punishment for a first-time conviction under § 1325 is a "fine[] … or imprison[ment] not more than 6 months."  *Id.*

Notwithstanding *Ramirez-Ortiz* and *Rodriguez-Rodriguez*, Defendant contends he has a right to a jury trial because of the D.C. Circuit's recent holding in *Bado v. United States*. There, the defendant, an immigrant from Burkina Faso, was in asylum proceedings when he was charged by information with three counts of misdemeanor sexual assault of a minor. *Bado v. United States*, 186 A. 3d 1243, 1247 (D.C. Cir. 2018). This charge halted his asylum proceedings because "if convicted, under U.S. immigration law he would be barred from receiving political asylum and removed from the United States." *Id.* The court held the defendant was entitled to a jury trial because "the Sixth Amendment entitles a defendant to a jury trial if he is charged with a deportable offense, even if the maximum period of incarceration does not exceed six months." *Id.* at 1260. In so concluding, the court applied the following two-step analysis from *Blanton*: "(1) identification of the penalties for conviction of an offense, and (2) an evaluation of whether the penalties, viewed together, are sufficiently severe to warrant a jury trial by comparison to the possibility of imprisonment for more than six months[.]" *Id.* at 1252 (internal citations omitted).

The Government correctly argues *Bado* is "inapposite" because the defendant there became deportable only upon conviction, whereas here, Defendant "has no legal status in the United States and was subject to deportation regardless of whether he was convicted of a § 1325 violation." (Govt's Response in Opposition ("Opp'n Br."), ECF No. 58, at 4 n. 4.) Accordingly, the Government contends, like the court in *Ramirez-Ortiz*, that Defendant does not have a right to jury trial because the only penalties that flow from the charge at issue are imprisonment up to six months and a fine. *See Blanton*, 489 U.S. at 543 ("A defendant is entitled to a jury trial in such circumstances only if he can demonstrate that any additional statutory penalties, viewed in conjunction with the maximum authorized period of incarceration, are so severe that they reflect a legislative determination that the offense in question is a 'serious' one.")

Defendant nevertheless contends deportation and ineligibility for asylum are penalties for a § 1325 conviction. Initially, Defendant points to a July 2018 Policy

Memorandum from the United States Citizenship and Immigration Services ("USCIS"), for the proposition that deportation is a possible penalty for a § 1325 violation:

> USCIS personnel may find an applicant's illegal entry, including any intentional evasion of U.S. authorities, and including any conviction for illegal entry where the alien does not demonstrate good cause for the illegal entry, to weigh against a favorable exercise of discretion.

(Opening Br. at 8) (citing USCIS, *Guidance for Processing Reasonable Fear, Credible Fear, Asylum, and Refugee Claims in Accordance with Matter A-B-*, PM-062-0162, July 18, 2018). In response, the Government notes the guidance only applies to USCIS personnel's "exercise of discretion" and that guidance is triggered by *any* illegal entry. (Opp'n Br. At 5.) Furthermore, the Government contends the guidance does not constitute "state action" under *Blanton*, (*id.*), in which the Supreme Court clarified that the two-step analysis applies only to "penalties resulting from state action, *e.g.*, those mandated by statute or regulation." *Blanton*, 489 U.S. at 543 n.8. Although Defendant argues the guidance constitutes "state action," (Reply Br. At 2), the Court disagrees because the guidance is merely discretionary, nothing more. In addition, the guidance applies to any illegal entry, not just a conviction under § 1325.

Defendant also contends deportation is a penalty for a § 1325 conviction based on a November 9, 2018 regulation from the Attorney General and Secretary of Homeland Security, which provides that an "alien entering along the Southern border with Mexico may not be granted asylum if the alien is subject to a presidential proclamation … suspending or limiting the entry of aliens on this border." *E. Bay Sanctuary Covenant v. Trump*, 932 F.3d 742, 754 (9th Cir. 2018), (quoting Aliens Subject to Bar on Entry Under Certain Presidential Proclamations: Procedures for Protection Claims, 83 Fed. Reg. 55,934 (Nov. 9, 2018) (to be codified at 8 C.F.R. §§ 208, 1003, 1208)) (internal quotation marks omitted). This regulation was enacted on the same day the President of the United States issued a proclamation "suspending the entry of any alien into the United States across the international boundary between the United States and Mexico, but exempting from that suspension any alien who enters the United States at a port of entry and properly presents

for inspection." *Id.* at 754–55 (quoting Addressing Mass Migration Through the Southern Border of the United States, 83 Fed. Reg. 57,661, 57,663 (Nov. 9, 2018)) (internal quotation marks omitted).   The Ninth Circuit concluded that the effect of the regulation "is to make asylum unavailable to any alien who seeks refuge in the United States if she entered the country from Mexico outside a lawful port of entry." *Id.* at 755.   Accordingly, Defendant contends the regulation renders him ineligible for asylum—and constitutes a serious penalty under *Bado*.   However, the Ninth Circuit denied the government's motion for a stay of the district court's temporary restraining order enjoining enforcement of the regulation.  *Id.*   Though Defendant contends the Court should "assume that [the regulation] will apply to [Defendant's] claims or stay this appeal until their application becomes clear," (Reply Br. at 3), the regulation did not apply to Defendant at the time of trial, and does not apply now.  *See id.*; *Trump v. E. Bay Sanctuary Covenant*, 139 S. Ct. 782 (2018) (denying application for stay).   The magistrate judge therefore did not err by holding a bench trial.

## B. Visa Application and Hearsay Objections

Defendant contends the magistrate judge erred by admitting his visa application in violation of the rule against hearsay.[1]   The Court "review[s] de novo the court's interpretation of the hearsay rule, but review[s] the court's admission of evidence for abuse of discretion." *United States v. Town of Colorado City*, 935 F. 3d 804, 807 (9th Cir. 2019) (citing *United States v. Morales*, 720 F.3d 1194, 1199 (9th Cir. 2013)).

Defendant contends the magistrate judge erred by concluding Defendant's visa application was a government record that satisfied the public records exception in Rule 803(8) of the Federal Rules of Evidence, and in the alternative, by admitting the visa

---

[1] The Government contends that Defendant waived these arguments because he failed to raise them prior to his appeal, (Opp'n Br. at 7) (citing *United States v. Castellon*, 135 Fed. Appx. 122, 124 (9th Cir. 2005) (unpublished)), but Defendant raised the arguments in his motions *in limine*. (*See* ECF No. 31 at 2.) Accordingly, the Court may address these issues on appeal.

application under the business records exception in Rule 803(6).[2]  (Opening Br. at 9-11.)
The Government contends the application was correctly admitted as public record under
803(8).  A public record is defined as a record or statement of public office if "(A) it sets
out: (i) the office's activities; [or] (ii) a matter observed while under a legal duty to report,
but not including, in a criminal case, a matter observed by law-enforcement personnel; …
and (B) the opponent does not show that the source of information or other circumstances
indicate a lack of trustworthiness."  Fed. R. Evid. 803(8).  Defendant contends the
magistrate judge erred by admitting the visa application under this provision because it
does not "set[] out (1) the office's activities" or (2) "a matter observed while under a legal
duty to report."  (Opening Br. at 10) (citing *id.*)

Defendant also contends that admission of the visa application ran afoul of the Ninth
Circuit's decision in *United States v. Morales*, 720 F.3d 1194 (9th Cir. 2013).  In *Morales*,
the Ninth Circuit held a Form I-826 filled out by a Border Patrol Agent that contained the
date and location of an alien's arrest, the funds found in the alien's possession, and the
alien's basic biographical information (name, gender, and date and place of birth), as well
as a notice of rights and a request for disposition, were inadmissible under Rule 803(8).
720 F.3d at 1197–98.  There, the aliens selected the third option in the "request for
disposition" and signed their names, "thus admitting they were in the United States illegally
and requesting to be returned to their country."  *Id.* at 1198.  The government relied on this
signed statement along with the alien's statements to agents about their names and places
of birth to prove their alienage at the defendant's trial, where she was found guilty for
conspiracy to transport aliens.  *Id.* at 1201–02.  The Ninth Circuit concluded the alien's

---

[2] Defendant argues the magistrate judge erred by admitting the visa application under Rule 803(6),
(Opening Br. at 11), because that exception "does not apply to records of government agencies, which are
public records for purposes of Rule 803."  *Morales*, 720 F.3d at 1201.  The Government concedes this
point.  (Opp'n Br. at 9 n. 7.)  Nevertheless, this was harmless error because the visa application was
properly admitted under Rules 803(8) and 801(d).  *See United States v. Orozco*, 590 F.2d 789, 794 (holding
district court did not abuse its discretion in admitting TECS cards based on the business records exception
instead of the public records exception, because they were properly admissible as public records).

19-CR-3623 BLM (DMS)

signed statement was not admissible under Rule 803(8) because it did not "describe 'activities" of the government. *Id.* at 1202. The court also concluded that the biographical and other statements attributed to the aliens were not statements by government employees who had a legal duty to report, and thus, could not be admitted under the public records exception unless, as here, the statements satisfied some other hearsay exception. *Id.*

Defendant's visa application was properly admitted under the public records exception and does not run afoul of *Morales*. First, Defendant's application was kept by the Consulate in the regular course of business. Second, the application stated: "All declarations made in this application are unsworn declarations made under penalty of perjury[,]" (Ex. B. to Opening Br., ECF No. 57-2 at 4-5), and a government official had a duty to report those declarations, if the declarant elected to make a statement. Although Defendant argues he had no "duty to report" because he "could have declined to submit a visa application," (Reply Br. at 5), once Defendant decided to submit the application, he had an obligation to be truthful and the government official had a duty to accurately report the information provided by Defendant.

While Defendant contends the application contains a second inadmissible layer of hearsay, *i.e.,* "the visa applicant's statements," the statements were properly admitted as admissions. Under Rule 801(d)(2), an opposing party's statement is "not hearsay" if it "is offered against an opposing party" and "was made by the party in an individual or representative capacity[.]" Fed. R. Evid. 801(d)(2)(A). "For the document to be admissible, each layer of hearsay must satisfy an exception to the hearsay rule." *Sana v. Hawaiian Cruises, Ltd.*, 181 F.3d 1041, 1045 (9th Cir. 1999) (citing Fed. R. Evid. 805). Here, the record maintained by the consulate is admissible under 803(8), and the Defendant's statements, as reflected in the visa application, are admissible under 801(d)(2)(A). Accordingly, the magistrate judge did not abuse her discretion by admitting the visa application.

/ / /

/ / /

**C. Admission of a Partial Copy of the Passport**

Next, Defendant challenges the magistrate judge's admission of a partial copy of a document found on Defendant's person at the time of his arrest, and the alleged characterization of the photocopy as a "passport." The court reviews the magistrate judge's "evidentiary rulings for an abuse of discretion and its interpretation of the Federal Rules of Evidence *de novo*." *United States v. Lindsay*, 931 F.3d 852, 859 (9th Cir. 2019). The Court reviews the magistrate judge's "underlying factual determinations for clear error." *United States v. Lukashov*, 694 F.3d 1107, 1114 (9th Cir. 2012) (citing *United States v. Shryock*, 342 F. 3d 948, 981 (9th Cir. 2003)).

1. Admission of the Photocopy

Defendant contends the photocopy was inadmissible because (1) it was hearsay without exception; (2) it violated *Miranda*; (3) the government violated Rule 16 of the Federal Rules of Criminal Procedure; and (4) it was not admissible under Rule 1003 of the Federal Rules of Evidence. (Opening Br. at 13.)

a. Hearsay

First, Defendant contends the magistrate judge erred in admitting the photocopy because it did not qualify under Rule 801(d)(2)(b). (Opening Br. at 13.) Rule 801(d)(2)(B) states a statement is not hearsay when "[t]he statement is offered against an opposing party and … is one the party manifested that it adopted or believed to be true." Fed. R. Evid. 801(d)(2)(B).

At trial, Judge Major concluded the photocopy was properly admitted as an adopted admission of Defendant's nationality:

> I … find that it is an adoptive admission in that the agent was attempting to get immigration information, citizenship information, … from the individuals who had been arrested, and the defendant provided the passport to the officer

(Trial Transcript at 77:12–16.) Defendant contends this conclusion is factually and legally wrong.

Defendant contends the magistrate judge's findings were clearly erroneous because the agent's testimony neither supports that the Agent asked Defendant about his citizenship nor that Defendant handed his document in response to the Agent's inquiry.  (Opening Br. at 14).  At issue is the following testimony from Agent Fulton:

> Q: How were you able to get that information from him if you do not speak Punjabi?
>
> A: So … there was another Spanish individual in the room—or in the back of the vehicle.  I asked him for his documents, and [Defendant] didn't do anything[.] And then the other guy in the back of the vehicle actually pointed to his pocket, and [Defendant] said, "Oh. Okay," and he pulled out his passport.
>
> Q: You asked the gentleman who spoke Spanish for his ID documents?
>
> A: Yes.
>
> Q: And he, through someone, essentially pointed to [Defendant's] pocket?
>
> A: Yes,  … I said, "*Tienes documentos?*" And they all started getting out their documents, and I said – I pointed to him, and I was like, "Documents. Documents" And then a guy pointed at his pocket.

(Trial Transcript, at 63:11–20; 56:23–25; 57:1–6.)  The testimony above is consistent with the magistrate judge's findings.  No "clear error" occurred.

Next, Defendant contends the magistrate judge erred because "the government did not lay foundation to admit the 'passport' as an adoptive admission," and the court did not "first find that sufficient foundational facts have been introduced for the jury reasonably to conclude that the defendant did actually hear, understand and accede to the statement." (Opening Br. at 14) (citing *United States v. Orellana-Blanco*, 294 F. 3d 1143, 1149 n. 10 (9th Cir. 2002) (internal quotation marks omitted).  The Court disagrees.  Although the agent did not speak Punjabi, he asked the Spanish-speaking individual in the back of the vehicle for documents.  (Trial Transcript at 57:1–6.)  The Spanish-speaking individual pointed to his pocket, and Defendant replied "Oh. Okay," and pulled out the document.

19-CR-3623 BLM (DMS)

(*Id.*)    The magistrate judge credited the Agent's testimony.    Accordingly, there is substantial evidence that Defendant understood the Agent's request and handed over the document in order to comply with it and establish his identity.  *See Orellana-Blanco*, 294 F. 3d at 1148–49.  The document was properly admitted as an adoptive admission as it was used by Defendant to show his identification.  *See United States v. Cuesta*, No. 06-CR-40-AWI, 2007 WL 2729853, at *17 (E.D. Cal. Sept. 19, 2007) (finding a driver's license constituted an adoptive admission where defendant turned over his license upon request, and thus did not "passively possess [the] license, but carried it with him to evidence his authorization to drive and his identity[.]")   Accordingly, the magistrate judge correctly admitted the document as an adoptive admission of Defendant's identity and citizenship.

> b. *Miranda*

Next, Defendant argues the document was inadmissible because it was "introduced at trial in violation of *Miranda*."  (Opening Br. at 15.)  The Court reviews "de novo a … decision to admit statements that may have been obtained in violation of *Miranda*[,]" but reviews the underlying factual findings for clear error.  *United States v. Narvaez-Gomez*, 489 F. 3d 970, 973 (9th Cir. 2007).

Defendant argues "the magistrate judge agreed that Mr. Singh was in custody and not Mirandized[,]" but nevertheless admitted the document as "as a 'field statement,'" (Opening Br. at 15), stating:

> "[In] this situation, the agent essentially was asking, "What is your citizenship?" The defendant provided this information. So I think it would be appropriate under … the law governing field admissions."

(Trial Transcript at 77:8–11.)  Defense counsel requested clarification from the court:

> Ms. Fish: And, Your Honor, just so I understand, is the Court then ruling that my client was not in custody at that time?
>
> The Court: He was in custody in the sense that he wasn't free to leave just like with any field statements.

(*Id.* at 77:17–21.)

14

1    "[T]he question [w]hether a person is in custody or otherwise deprived of his

2    freedom of action in any significant way, *Miranda v. Arizona*, 384 U.S. 436, 444, 86 S. Ct.

3    1602, 16 L. Ed. 2d. 694 (1966), is answered by reviewing the totality of facts involved at

4    the time of the alleged restraint." *United States v. Medina-Villa*, 567 F.3d 507, 519 (9th

5    Cir. 2009) (internal quotation marks omitted).  "Pertinent areas of inquiry include the

6    language used by the officer to summon the individual, the extent to which he or she is

7    confronted with evidence of guilt, the physical surroundings of the interrogation, the

8    duration of the detention and the degree of pressure applied to detain the individual." *Id.*

9    (quoting *United States v. Booth*, 669 F. 2d 1231, 1235 (9th Cir. 1981) (internal quotation

10   marks omitted)).  "The subject of the inquiry is whether a reasonable person in such

11   circumstances would conclude that after brief questioning he or she would not be free to

12   leave." *Id.*

13       The Government argues Defendant was not in custody and therefore no *Miranda*

14   warnings were necessary.[3]  The Court agrees.  The Ninth Circuit has repeatedly held that

15   brief questioning near the border under similar circumstances is a non-custodial *Terry* stop

16   that does not trigger *Miranda*.  *See, e.g.*, *United States v. Galindo-Gallegos*, 244 F.3d 728,

17   732 (9th Cir. 2001) (holding questioning of 15 to 20 aliens about immigration status by

18   two law enforcement officials in isolated area near border where the group was running

19   was a non-custodial *Terry* stop).

---

[3] Defendant argues the Government did not raise this argument prior to appeal, and is now estopped from arguing the opposite. (Reply Br. at 10.)  At trial, the Government noted Agent Fulton viewed the request of Defendant and others to empty their pockets "as being a search done incident to arrest …."  (Trial Transcript at 11:23–25)  "Judicial estoppel is an equitable doctrine that precludes a party from gaining an advantage by asserting one position, and then later seeking an advantage by taking a clearly inconsistent position."  *Hamilton v. State Farm Fire & Cas. Co.*, 270 F.3d 778, 782 (9th Cir. 2001).  Here, the Government simply relayed how Agent Fulton viewed the request of Defendant and did not argue that Defendant was in custody.  Because "an officer's subjective and undisclosed view concerning whether the person being interrogated is a suspect is irrelevant to the assessment whether the person is in custody," *Stansbury v. California*, 511 U.S. 318, 319 (1994), the Government is not barred by judicial estoppel here.

19-CR-3623 BLM (DMS)

The initial encounter here occurred at night in a remote area near the border, where approximately six individuals were observed by an RVSS operator crossing the All-American Canal. When Agent Barron arrived at the scene, he encountered two individuals hiding in the brush and crouched under a tree. After contacting them, Agent Barron hand-cuffed them and escorted them along with a third individual to Agent Fulton's vehicle, and then left to search for the remaining individuals. Agent Fulton removed the hand-cuffs and placed Defendant and the other individuals in the vehicle to obtain biographical information. Defendant produced the document at issue when he was in the vehicle with the other two people. (Trial Transcript at 62:11–21.) Agent Fulton had not yet determined Defendant's citizenship and was still investigating. (*Id.* at 83–84.) Considering risk of flight and officer safety, particularly given the number of individuals, the time of night and remote location, the circumstances here are akin to those in *Galindo-Gallegos* and did not result in custodial interrogation necessitating *Miranda* warnings. The statements attributed to Defendant occurred during a valid *Terry* stop and helped the Agent determine whether he should arrest Defendant. *See Berkemer v. McCarty*, 468 U.S. 420, 438–39 (1984) (stating where officer lacks probable cause but "whose observations lead him reasonably to suspect" criminal activity is afoot, he may briefly detain and ask "a moderate number of questions to determine [the individual's] identity and try to obtain information confirming or dispelling the officer's suspicions.") (internal quotation marks and citations omitted). So it is here.

### c. Rule 16 of the Federal Rules of Criminal Procedure

Next, Defendant argues the magistrate judge erred by overruling Defendant's objection that the government violated Rule 16 of the Federal Rules of Criminal Procedure by not allowing Defendant to inspect the original passport. (Opening Br. at 15.) The Court reviews the magistrate judge's "discovery rulings … for abuse of discretion" and its "interpretation of discovery rules de novo." *United States v. Cano*, 934 F.3d 1002, 1023 n. 15 (9th Cir. 2019) (internal citations omitted).

Rule 16(a)(1)(E) provides that the government must permit the defendant to inspect and copy evidence that is within its "possession, custody, or control" and, among other circumstances, was "obtained from or belongs to the defendant."   Fed. R. Crim. P. 16(a)(1)(E)(iii).  The Government contends the original passport was held by ICE, and thus it was not "within the government's possession, custody, or control," and if it had the passport, it would not have offered photocopies under Rule 1003.  (Opp'n Br. at 15.) Accordingly, the Government contends they were not required to hand over the passport under *United States v. Bryan*, 868 F. 3d 1032, 1036 (9th Cir. 1989), where the Ninth Circuit held "a federal prosecutor need not comb the files of every federal agency which might have documents regarding the defendant in order to fulfill his or her obligations under Rule 16(a)(1)(c)."  In response, Defendant contends *Bryan* is inapplicable because the Ninth Circuit clarified the holding in *Bryan* in *United States v. Santiago*, where it stated that all items the government "has knowledge and access to" are discoverable and "agency involvement in an investigation [is] a sufficient, but not necessary, factor to show that the prosecution was in 'possession' of the agency's information."  46 F. 3d 885, 894 (9th Cir. 1995) (holding the United States Attorney's Office had knowledge of and access to inmate files held by the Bureau of Prisons for the purposes of Rule 16 discovery).

Nevertheless, the Court declines to find the Government had access to the passport because "when Defendant left criminal custody, his personal property—including the passport—left Border Patrol custody pursuant to Border Patrol policies and traveled with him into immigration custody." (Opp'n Br. at 16.)  Further, as the Government notes, there is neither a claim nor evidence in the record indicating that "the passport left Border Patrol custody for any nefarious reason" or to prevent Defendant from accessing it.  (*Id.* at n. 14.) Finally, as the Government notes, the magistrate judge found Defendant's visa application and certification (Exhibits 6 and 7) sufficient to establish Defendant's alienage, making the passport copy unnecessary to the Government's case.  (Opp'n Br. at 17) (quoting Trial Transcript at 91) ("To be clear on the record, I find that Government's Exhibits 6 and 7 by themselves are sufficient to establish alienage in this case and that the defendant is not a

citizen of the United States.")   The magistrate judge did not abuse her discretion in overruling Defendant's objections.

### d.   Rule 1003 of the Federal Rules of Evidence

Defendant also argues the magistrate judge erred by admitting a photocopy of the passport.   "A duplicate is admissible to the same extent as the original unless a genuine question is raised about the original's authenticity or the circumstances make it unfair to admit the duplicate."   Fed. R. Evid. 1003.   Defendant argues the photocopy was inadmissible because Defendant "raised genuine questions as to whether the passport was authentic" and "it was unfair to admit the photocopy."   (Opening Br. at 17.)

Defendant argues the document could have been inauthentic because "[i]t is not uncommon for persons crossing the border to possess fake passports with incorrect details." (Opening Br. At 17.)   In response, the United States argues it did not seek to admit the photocopy as an authentic "passport," but rather sought to admit the photocopy as a document that Defendant carried on his person at the time of his arrest—a document that he used to identify himself as a citizen of India.   (Opp'n Br. at 17.)   Accordingly, the Government argues "the trustworthiness of the *duplicate* as a correct copy of the document Defendant carried, not the trustworthiness of the passport as authentic, is what mattered for Rule 1003 purposes."   (*Id.* at 17–18) (emphasis in original).   The Court agrees.   At trial, Agent Fulton testified that the photocopy admitted as Exhibit 5 was the same document he inspected prior to Defendant's arrest.   (*See* Trial Transcript at 57–59.)   Accordingly, the Court finds there is not a "genuine question… about the original's authenticity."   *See* Fed. R. Evid. 1003.

### 2.   Photocopy as Passport

Next, Defendant contends the Government committed misconduct by characterizing the photocopy as a passport and that the magistrate judge erred in admitting the photocopy as a passport because doing so violated Rule 1002 of the Federal Rules of Evidence.

/ / /

/ / /

19-CR-3623 BLM (DMS)

1

a.  <u>Prosecutorial Misconduct</u>

2      Defendant contends the magistrate judge erred by overruling Defendant's objection

3  to the Government's characterization of the photocopy as a passport.  The Court generally

4  reviews a magistrate judge's ruling on prosecutorial misconduct objections for abuse of

5  discretion.  *See United States v. Wijegoonaratna*, 922 F. 3d 983, 987–88 (9th Cir. 2019);

6  *United States v. Tucker*, 641 F.3d 1110, 1120 (9th Cir. 2011); *United States v. Tam*, 240

7  F.3d 797, 802 (9th Cir. 2001).  Defendant contends the Court should review the question

8  de novo.  (Opening Br. at 18.)  The Court need not address the proper standard of review

9  as no prejudice resulted from the characterization of the document as a passport.  *See*

10  *Wijegoonaratna*,  922 F.3d at 989 (because the Court "reach[es] the same results under

11  review for abuse of discretion and de novo review, we need not and decline to weigh in on

12  the intra circuit conflict[.]")

13      When reviewing alleged prosecutorial misconduct, the court "focuses on its asserted

14  impropriety and substantial prejudicial effect."  *United States v. Weatherspoon*, 410 F.3d

15  1142, 1145 (9th Cir. 2005).  The relevant inquiry when addressing prosecutorial comments

16  to which a defendant objects is "whether the prosecutor's statement, when considered in

17  the context of the entire trial, affected the [fact-finder's] ability to judge the evidence

18  fairly."  *United States v. Sherlock*, 962 F.2d 1349, 1364 (9th Cir. 1989).

19      Here, Defendant contends the prosecutor engaged in misconduct by referring to

20  Exhibit 5 as a "passport," when it was only admitted as a photocopy of a page of a

21  document found on Defendant.  (Opening Br. At 18–19.)  At trial, the prosecutor argued

22  Defendant's "passport and visa document," taken together, could prove alienage because

23  the identifiers on the application correspond with "page 3 of the passport that was found in

24  [Defendant's] pocket."  (Trial Transcript at 88:13–18.)  Defense counsel objected, arguing

25  "the Government keeps referring to Page 3 as from a passport, but … the Court specifically

26  only admitted that as a page from a document[.]"  (*Id.* at 89:13–19.)  The magistrate judge

27  overruled Defendant's objection:

28      The Court:  No.  The Officer testified that it was a passport.

19

> [Defense Counsel]:  With no expertise in, Your Honor.
>
> …
>
> The Court:  I let that in.  He didn't testify that it was an authentic Indian passport, but he testified that it was a passport based upon his experience and seeing one before and … that it was provided as a passport.  So the relevant evidence from him was that he received a passport and then Page 3.

(Trial Transcript at 89:20–25; 90:1–5.)  Defendant argues the magistrate judge erred by overruling Defendant's objection because the prosecutor's reference to the photocopy as passport "affected [the magistrate judge's] view of the evidence."  (Opening Br. At 19.)  The Court disagrees.  At trial, two pieces of relevant evidence were offered.  First, Exhibit 5 was "admitted as a page from a document that was on [Defendant's] person."  (Trial Transcript at 83:3–4.)  The Government clarified it did not offer this photocopy as a valid passport.  (*Id.* at 76.)  Although Exhibit 5 was only admitted as a photocopy of a document found on Defendant, the magistrate judge later referred, and permitted reference to it, as a "passport" based on Agent Fulton's testimony.  This characterization, however, did not result in any prejudice.  The evidentiary value of Exhibit 5 was that Defendant carried it on his person and used it to identify himself and his citizenship.  That, of course, was relevant to an element of the offense: alienage.  The record reflects that the magistrate judge received the Exhibit and used it in that limited manner, as did government counsel.  In addition, Judge Major ultimately rested her determination of alienage on Exhibits 6 and 7, not Exhibit 5.  No prosecutorial misconduct occurred and no prejudice resulted from reference to the document as a passport.

### b.  Rule 1002

Next, Defendant contends admitting the photocopy as a "passport" violates Federal Rule of Evidence 1002 because the photocopy was incomplete.  (Opening Br. At 19.)  However, as discussed above, the photocopy was only admitted as a document found on Defendant's person and used by him to show his nationality.

Federal Rule of Evidence 1002 states: "An original writing, recording, or photograph is required in order to prove its content unless these rules or a federal statute provides otherwise."   Defendant contends the magistrate judge erred by accepting the Agent's testimony that the document handed over by Defendant was a passport because "the entire document was not admitted; only Page 3 was." (Opening Br. At 19.)  Defendant contends this testimony runs afoul of *United States v. Bennett*, where the Ninth Circuit held a custom officer's testimony about a defendant's travel patterns were inadmissible when they were based exclusively on the defendant's GPS data, rather than actual knowledge of the travel patterns.  363 F. 3d 947, 952–53 (9th Cir. 2004) (concluding the agent "never actually observed [the defendant's] boat travel the path depicted by the GPS," and as such his testimony was inadmissible)  However, Agent Fulton testified based on a document he saw at the time he arrested Defendant, not on the photocopy of Page 3 admitted as Exhibit 5.  Moreover, as noted, the magistrate judge did not consider Exhibit 5 an authentic "passport" based on his testimony.

**D. <u>Equal Protection and Non-Delegation Challenges to § 1325(a)</u>**

1. <u>Equal Protection Challenge</u>

Defendant argues the Court should vacate his conviction for violation of 8 U.S.C. § 1325(a)(1) because § 1325 is facially unconstitutional under the Equal Protection Clause in light of the Supreme Court's recent decision in *Session v. Morales-Santana*, 137 S. Ct. 1678 (2018).  (Opening Br. at 22.)  The Court reviews *de novo* the constitutionality of a statute.  *United States v. Dowai*, 839 F.3d 877, 879; *United States v. Younger*, 398 F. 3d 1179, 1192 (9th Cir. 2005).

Here, Defendant raises a facial challenge to the constitutionality of § 1325, which provides that: "Any alien … who (1) enters or attempts to enter the United States at any time or place other than as designated by immigration officers, …, shall, for the first commission of any such offense, be fined under Title 18 or imprisoned not more than 6 months, or both … ."  Title 8, United States Code, Section 1101(a)(3) defines the term

"alien" to mean "any person not a citizen or national of the United States."  8 U.S.C. § 1101(a)(3).

In *Morales-Santana*, the Supreme Court held the gender-based distinctions for derivative citizenship set forth in 8 U.S.C. §§ 1401(a)(7) and 1409(a),(c) are unconstitutional under the Equal Protection Clause.  137 S. Ct. at 1698, 1700–01 ("The gender-based distinction infecting §§ 1401(a)(7) and 1409(a) and (c), we hold, violates the equal protection principle.")  Derivative citizenship is "the acquisition of U.S. citizenship by a child born abroad, when one parent is a U.S. citizen, the other, a citizen of another nation." *Id.* at 1686.  Defendant contends *Morales-Santana* renders § 1325 facially unconstitutional because a conviction under § 1325 requires the government to prove the defendant is "not a citizen or national." (Opening Br. at 22.)

Several courts in this district have already addressed, and rejected the argument, that the holding in *Morales-Santana* renders § 1325 facially invalid.  In *Ibarra-Hernandez*, for example, the court found the defendant was unable to meet her burden to demonstrate that "no set of circumstances exists under which the statute would be valid," as is required in a facial challenge to the constitutionality of a law, because "[t]he severability clause in the Immigration and Nationality Act ('INA') dictates that the remainder of 8 U.S.C. §§ 1401 and 1409 were not affected by *Morales-Santana*."  *United States v. Ibarra-Hernandez*, No. 20-mj-20300-RNB-H, 2020 WL 3078514, at *5 (S.D. Cal. Jun. 9, 2020) (quoting *United States v. Duffy*, 752 F. App'x 532, 533 (9th Cir. 2019) (unpublished) (citing 8 U.S.C. § 1101 note ("If any provision of this title … is held invalid, the remainder of the title … shall not be affected thereby."))); *accord United States v. Madero-Diaz*, 752 F. App'x 537, 538 (9th Cir. 2019) (unpublished) (holding the remainder of §§ 1401 and 1409 were not affected or declared unconstitutional by *Morales-Santana* because of the INA's severability clause).  The Ninth Circuit has also rejected the argument that *Morales-Santana* invalidates the illegal reentry statute (8 U.S.C. § 1326) because of the INA's severability clause.  *See United States v. Mayea-Pulido*, 946 F. 3d 1055, 1066 n. 10 (9th Cir. 2020); *Duffy*, 752 F. App'x at 533 (rejecting a facial challenge to the constitutionality

19-CR-3623 BLM (DMS)

of § 1326 based on the Supreme Court's decision in *Morales-Santana*).  Accordingly, the Court agrees with *Ibarra-Hernandez*, and finds Defendant has failed to establish that § 1325 is facially unconstitutional.  *See* 2020 WL 3078514, at \*5; *see also United States v. Benito-Mendoza*, No. 19-MJ-23597-RNB-CAB, 2020 WL 206183, at \*2 (S.D. Cal. Jan. 13, 2020) (rejecting a facial challenge to the constitutionality of 8 U.S.C. § 1325 based on the Supreme Court's decision in *Morales-Santana*).

### 2. Nondelegation Challenge

Defendant also argues that § 1325 is unconstitutional because § 1325(a)(1)'s reference to a "designated" place of entry violates the non-delegation doctrine.  (Opening Br. at 21.)  "Article I of the Constitution provides that '[a]ll legislative Powers herein granted shall be vested in a Congress of the United States.'"  *Gundy v. United States*, 139 S. Ct. 21116, 2123 (2019)).  "Accompanying that assignment of power to Congress is a bar on its further delegation."  *Id.*  Thus, Congress "may not transfer to another branch 'powers which are strictly and exclusively legislative.'"  *Id.* (quoting *Wayman v. Southard*, 23 U.S. 1, 42–43 (1825)).

Nevertheless, the Supreme Court has acknowledged "that in our increasingly complex society, replete with ever changing and more technical problems, Congress simply cannot do its job absent an ability to delegate power under broad general directives."  *Mistretta v. United States*, 488 U.S. 361, 372 (1989).  Therefore "a statutory delegation is constitutional as long as Congress 'lay[s] down by legislative act an intelligible principle to which the person or body authorized to [exercise the delegated authority] is directed to conform.'"  *Gundy*, 139 S. Ct. at 2123 (quoting *Mistretta*, 488 U.S. at 372).  "The constitutional question" is therefore "whether Congress has supplied an intelligible principle to guide the delegee's use of discretion."  *Id.*

Section 1325(a)(1) "makes it a crime to 'enter[] or attempt[] to enter the United States at any time or place other than as designated by immigration officers.'"  *United States v. Corrales-Vazquez*, 931 F. 3d 944, 950 (9th Cir. 2019) (quoting 8 U.S.C. § 1325) ("Section 1325(a)(1) covers aliens who attempt to enter outside of an open port of entry.").

Defendant notes that, by its plain language, whether a defendant's conduct violates § 1325(a)(1) depends on what place immigration officers—members of the Executive branch—have designated for entry.  (Opening Br. at 22.)  Accordingly, Defendant contends Congress violated the nondelegation doctrine by delegating "to the executive the ability to define a criminal provision's scope[,]"  (*id.*), without providing "an intelligible principle in § 1325(a)(1)'s designation of ports of entry."  (Reply Br. At 19.)

Notwithstanding Defendant's arguments, several courts in this district have already held § 1325(a)(1) does not constitute an impermissible delegation.  *See, e.g.*, *Ibarra Hernandez*, 2020 WL 3078514, at *6 (S.D. Cal. Jun. 9, 2020); *United States v. Zeferino-De Jesus*, 19-MJ-23139-AHG-DMS, 2020 WL 94373 (S.D. Cal. Jan 7, 2020); *United States v. Revolorio-Tambito*, No. 19-MJ-10657-JLB, 2019 WL 5295086 (S.D. Cal. Oct. 17, 2019); *United States v. Nunez-Sobranis*, No. 18-CR-4781-MDD, 2019 WL 4141265 (S.D. Cal. Aug. 30, 2019).  Although Defendant contends there is no intelligible principle in § 1325(a), the court in *United States v. Nunez-Soberanis* noted "Ports of entry can only be designated or de-designated by the Secretary of Homeland Security subject to the Administrative Procedures Act … [t]o interpret Section 1325(a) to permit a border patrol agent to designate a portion of the border fence 'on a whim' is in direct conflict with Congress's clear statutory scheme."  *See Nunez-Soberanis*, 406 F. Supp. 3d at 839-40; *Ibarra Hernandez*, 2020 WL 3078514, at *6 (rejecting defendant's nondelegation challenge to § 1325(a)(1)); *Vazquez-Sanchez*, 2020 WL 2394969, at *3 ("Courts in this District have resoundingly rejected the non-delegation arguments presently raised by Defendant in the context of § 1325(a)(1)." (collecting cases).)  The Court agrees with *Nunez-Soberanis*, *Ibarra Hernandez*, and *Vazquez-Sanchez*, and finds § 1325(a)(1) does not violate the non-delegation doctrine.

**E.  Equal Protection and Due Process Challenge to "Streamline Court"**

Next, Defendant contends the Government's prosecution of him through the "Streamline Court," rather than the Central Violations Bureau ("CVB"), violates the Equal Protection and Due Process Clauses of the Constitution.  (Opening Br. at 22.)  As described

in Defendant's Motion, the CVB process is used to prosecute violations of certain federal laws, and violations of certain state laws that occur on federal property.  (Opening Br. at 22.)  Defendants prosecuted through CVB are rarely detained for more than a few hours and receive a notice to appear.  At their initial appearance, they meet with an attorney, who can help them negotiate a disposition, and CVB defendants are typically able to avoid any appearance through payment of a fine.  (*Id.*)  Because they are punishable by no more than six months, § 1325 offenses are classified as Class B misdemeanors and are considered "petty offenses" under federal law.  *See* 18 U.S.C. §§ 19, 3559(a)(7).  Other petty offenses and some felonies are prosecuted through CVB.  Thus, Defendant argues that by prosecuting § 1325 offenses through the Streamline process instead of through CVB, the Government is treating similarly situated defendants differently on the basis of alienage, in violation of the Equal Protection Clause.  (Opening Br. at 22.)  Further, Defendant argues the Government discriminated against him and denied him due process by "depriving [him] of the substantial benefits of CVB court," even though his offense was less serious than other charges handled through CVB.  (*Id.*)

a. Equal Protection

The Equal Protection Clause under the Fourteenth Amendment states in relevant part that the government shall not "deny to any person within its jurisdiction the equal protection of the laws."  U.S. CONST. amend. XIV.  Multiple judges in this district have already addressed this issue and concluded that § 1325 does not create a classification based on alienage that would invoke strict scrutiny.  *See, e.g.*, *United States v. Jeronimo-Pablo*, No. 20mj20066-AHG, 2020 WL 4500628, at *2 (S.D. Cal. Aug. 5, 2020); *United States v. Ramirez-Ortiz*, 370 F. Supp. 3d 1151, 1154 (S.D. Cal. 2019); *United States v. Silva-Sosa*, No. 18MJ23270-KSC, 2019 WL 1470868, at *2-3 (S.D. Cal. Apr. 3, 2019); *United States v. Mazariegos-Ramirez*, No. 18MJ2276-WQH, 2019 WL 338923, at *2 (S.D. Cal. Jan. 28, 2019); *Chavez-Diaz*, 2018 WL 9543024, at *3.  Although Defendant contends the Government's decision to bring § 1325 charges creates a distinction based on alienage, the distinction is based on each defendant's alleged criminal activity, not alienage.  Rather

than creating a separate court for processing alien defendants regardless of what criminal charges are brought against them, the Streamline process is only used for charges brought based on alleged unlawful entry in violation of § 1325.  Accordingly, Defendant fails to demonstrate that "alienage, as a suspect class, is the basis for any distinct or different treatment" because all misdemeanor § 1325 cases are handled together and "[t]he scheduling of these matters in one courtroom or the other is charge based, not nationality based." *Chavez-Diaz*, 2018 WL 9543024,  at *2-3; *see also United States v. Mendoza-Hinojosa*, 216 F.3d 1085, 2000 WL 429701, at *2 (9th Cir. 2000) (unpublished table case) (stating a "distinction [exists] between statutes which classify based on alienage and statutes which classify based on criminal actions," and "imposing different rules on immigrants versus citizens does not in itself create a suspect classification").

The Court agrees with the other judges in this district and applies rational basis to Defendant's claims.  *See also United States v. Barajas-Guillen*, 632 F. 2d 749, 752 (9th Cir. 1980) ("[C]lassifications among aliens made pursuant to the immigration laws need only be supported by some rational basis to fulfill equal protection guarantees.") (internal quotation marks and citations omitted); *Plyler v. Doe*, 457 U.S. 202, 223 (1982) ("Undocumented aliens cannot be treated as a suspect class because their presence in this country in violation of federal law is not a 'constitutional irrelevancy.'")  Applying a rational basis standard, the question is whether "the classification at issue bears some fair relationship to a legitimate public purpose." *Hoffman v. United States*, 767 F.2d 1431, 1436 (9th Cir. 1985) (quoting *Plyler*, 457 U.S. at 216).

The Government argues that the Streamline Court serves the legitimate government interest of "[c]onservation of resources."  (Opp'n Br. at 31.)  Indeed, "[m]isdemeanor § 1325 cases are handled together rather than on the CVB calendar because it makes 'organizational sense' given the volume of § 1325 cases and divergent jurisdictional underpinnings of CVB court." *Ramirez-Ortiz*, 370 F. Supp. 3d at 1154 (internal quotation marks and citations omitted).  Furthermore, the Government notes that § 1325 cases cannot be placed on the CVB calendar "because they are not CVB matters."  (Opp'n Br. at 32.)

The CVB docket handles all matters charged by citation, information, indictment, or complaint pursuant to the Assimilative Crimes Act, 19 U.S.C. § 13. *See United States v. Sproed*, 628 F. Supp. 1234 (D. Or. 1984). As the court in *Chavez-Diaz* noted, the Assimilative Crimes Act includes "violations of certain federal laws as well as certain state laws, if the state law violations occur on tribal lands or on federal property," and includes "improper parking, illegal camping, speeding, civil disturbances, fish and wildlife infractions, driving while intoxicated and other offenses." 2018 WL 9543024, at *2 (citing CVB docket, http://www2.casd.uscourts.gov/cvb/). Accordingly, the court in *Chavez-Diaz* concluded "[i]mmigration violations, like 8 U.S.C. § 1325(a), are not subject to disposition as a CVB matter." *Id.* at *4. The Court agrees with *Chavez-Diaz* and *Ramirez-Ortiz*, and finds there is a rational basis for the court to "separately calendar matters that fall into groups by charge and type of proceedings." *Chavez-Diaz*, 2018 WL 9543024, at *3.

   b. Due Process

   *Chavez-Diaz* also addressed the substantive due process argument Defendant makes here—that Defendant's "substantive due process [rights were] violated because it shocks the conscience to deprive § 1325 defendants of the substantial benefits of CVB court while extending those benefits to other defendants charged with petty offenses who have an even greater risk of flight." (Opening Br. at 23.) There, the Court concluded the circumstances of the defendant's cases did not shock the conscious because the "[defendant] appeared promptly before a judge following his arrest, had counsel provided and all other rights insured," and "was allowed to plead to the offense and received a time served sentence," totaling "[a]ll in all, one day in custody." *Chavez-Diaz*, 2018 WL 9543024, at *4.

   The circumstances here differ, but these differences do not change the outcome for Defendant. Defendant's arrest and detention were supported by a showing of probable cause, which was reviewed and approved by a magistrate judge. After his detention, Defendant was brought to the federal building, where he met with an attorney. Defendant's attorney informed him that the government had offered a plea agreement that would allow him to plead guilty to a Class B misdemeanor in exchange for the prosecutor's

recommendation that he receive a time-served sentence, although the government did not offer him a chance to resolve his case through an alternative disposition, by fine, or by forfeiture.  (Opening Br. at 2.)  Notably, Defendant does not contend that any circumstance specific to his offense violates substantive due process, but rather that his prosecution and trial through the "Streamline Court" system "shocks the conscience."  (Opening Br. at 22) ("[S]ubstantive due process has been violated because it 'shocks the conscience' for the Government to blatantly deprive § 1325 defendants of the substantial benefits of the CVB court while extending those benefits to defendants charged with similar or more serious crimes who have a similar or greater risk of flight.")  The Court disagrees.  For the reasons set out above, the Streamline Court is an orderly and rational approach to addressing § 1325 cases.  None of its procedures shocks the conscience.

Defendant's claim that his trial and prosecution violated procedural due process also fails.  A procedural due process analysis considers three factors: (1) the "private interest that will be affected by the official action"; (2) "the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any of additional or substitute procedural safeguards"; and (3) "the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail."  *Matthews v. Eldridge*, 424 U.S. 319, 335 (1976).  Here, Defendant contends he has a substantial liberty interest due to "the traumatizing experience of being held in custody in substandard conditions[] and an overwhelmingly greater chance of being convicted of an offense," and that charging him in CVB court would "almost entirely alleviate the risk that [he] would be held in custody, subject to horrendous conditions, and convicted of an offense."  (Reply Br. at 23.)  Defendant also contends that the costs and administrative burden on the Government would be minimal.  The Court disagrees.  As already discussed, the Government has substantial interests in maintaining a separate calendar for CVB Court and § 1325 defendants.  Moreover, integrating § 1325 defendants into CVB court would be "unworkable" because CVB defendants are not taken into custody, and instead "allowed to continue living in the United

States without restriction"—a process that would "not be a manageable way to address individuals whose alleged offense is entering the United States without authorization." *See Jeronimo-Pablo*, 2020 WL 4500628, at *3–4.

c. <u>Selective Enforcement/Prosecution</u>

Lastly, Defendant argues the "Streamline Court" is unconstitutional because the government's policy of prosecuting everyone except § 1325 defendants in CVB court violates equal protection under the doctrine of selective prosecution or selective enforcement. (Opening Br. at 22–23.) The Government argues Defendant raises this issue for the first time on appeal, (Opp'n Br. at 1 n.1), noting Defendant did not raise the issue in his motion to dismiss (ECF No. 28) or at trial. (ECF No. 48.) "Ordinarily [the court of appeal] will not decide an issue that was not addressed by the [lower] court. However, we have discretion to review issues raised for the first time on appeal if to do so would not require the development of new facts." *Andersen v. Cumming*, 827 F.2d 1303, 1305 (9th Cir. 1987) (citations omitted). "This general rule is supported by considerations of fairness and judicial efficiency." *United States v. Flores-Payon*, 942 F.2d 556, 558 (9th Cir. 1991). Because this issue does not require the development of new facts, Defendant's claims will be addressed.

"A selective-prosecution claim is not a defense on the merits to the criminal charge itself, but an independent assertion that the prosecutor has brought the charge for reasons forbidden by the Constitution." *United States v. Armstrong*, 517 U.S. 456, 463 (1996). The standard for proving a selective prosecution claim is demanding. *Id.* So long as there is probable cause to support a prosecution, "whether or not to prosecute, and what charge to file or bring before a grand jury," falls within the prosecutor's discretion. *Id.*; *see also United States v. Batchelder*, 442 U.S. 114, 124 (1979) ("Whether to prosecute and what charge to bring before a grand jury are decisions that generally rest in the prosecutor's discretion.")

Defendant argues "[t]he requirements for selective prosecution are met because the U.S. Attorney's disparate treatment of CVB and § 1325 defendants has a discriminatory

19-CR-3623 BLM (DMS)

effect and a discriminatory purpose." (Opening Br. at 23.)  Defendant does not argue that being charged under § 1325 reflects selective prosecution, but rather that the manner in which he was processed reflects selective prosecution.  However, "[i]t is not clear that the manner of processing, rather than the fact of prosecution, can be the basis of a claim for selective prosecution." *Jeronimo-Pablo*, 2020 WL 4500628, at *4.  Moreover, Defendant has not provided any evidence that some § 1325 defendants are processed via CVB court whereas others, like himself, are subject to Streamline.  "CVB defendants and § 1325 defendants are not similarly situated merely because their offenses carry comparable punishments." *Id.* at *4.  As discussed above, alienage is an element of § 1325 and the distinction between aliens and non-aliens under the statute is constitutional. *See Fiallo v. Bell*, 430 U.S. 787, 792 (1977) (In the exercise of Congress's "broad power over immigration and naturalization," it "regularly makes rules that would be unacceptable if applied to citizens") (internal quotation marks and citations omitted).  Accordingly, Defendant's selective prosecution claim is without merit.

Defendant's claim that his charge should be dismissed because of selective enforcement also fails.  A selective enforcement claim focuses on the investigatory decisions of government agencies, including the United States Customs and Border Patrol. *United States v. Sellers*, 906. F.3d 848, 853 (9th Cir. 2018).  Although investigatory decisions of agencies are not entitled to the same deference as prosecutorial decisions by the United States Attorneys, *id.*, Defendant only argues that the "Border Patrol's referral of § 1325 defendants for prosecution in 'regular' court, rather than CVB court, … demonstrates a 'policy, plan, or a pervasive pattern' that constitutes selective enforcement." (Opening Br. at 23) (citing *Thomas v. County of Los Angeles*, 978 F. 2d 504, 509 (9th Cir. 1993)).  As such, Defendant's "selective enforcement claim relates solely to how the charge brought against him by the United States Attorney's office was processed," and is therefore "not related to any investigatory activity by the Border Patrol[.]" *Jeronimo-Pablo*, 2020 WL 4500628, at *4.  Accordingly, the Government's use of the Streamline Process does not amount to selective enforcement.

19-CR-3623 BLM (DMS)

# III.

## CONCLUSION AND ORDER

For these reasons, the Court denies Defendant's appeal and affirms Defendant's conviction and judgment.

**IT IS SO ORDERED.**

Dated:  September 10, 2020

Hon. Dana M. Sabraw
United States District Judge

19-CR-3623 BLM (DMS)